UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANDREW BUDZINSKI,

      Plaintiff,

v.                                                      Case No: 6:23-cv-1039-JSS-UAM

MYSTIC POWERBOATS, INC.,
JOHN COSKER, MARINEX
INTERNATIONAL, INC., and MARK
BELISLE,

      Defendants.
_____/

### ORDER

    In this case about the purchase of a boat, four summary judgment motions (Dkts. 82, 83, 84, 85) pend before the court. In two motions, Defendants, Mystic Powerboats, Inc., John Cosker, Marinex International, Inc., and Mark Belisle, seek summary judgment as to the claims that Plaintiff, Andrew Budzinski, asserts against them. (Dkts. 82, 83; *see* Dkts. 91, 92.) In addition, Budzinski moves for partial summary judgment as to his claims of unjust enrichment and money had and received against Marinex International and Belisle, (Dkt. 85; *see* Dkt. 93), and Mystic Powerboats and Cosker move for partial summary judgment as to Marinex International's liability to them on their indemnification cross-claim, (Dkt. 84; *see* Dkt. 90). All four motions are opposed. (Dkts. 86, 87, 88, 89.) Upon consideration, for the reasons outlined below, the court grants in part and denies in part Defendants' motions for summary judgment as to the claims against them and denies the remaining

motions for partial summary judgment.

## BACKGROUND[1]

Budzinski is the chief executive officer (CEO) of a financial company. (Dkt. 81 ¶ 1.) Mystic Powerboats is a boat manufacturer, and Cosker is its founder and CEO. (*Id.* ¶¶ 2–3.) Marinex International is a business selling luxury boats in foreign markets, and Belisle is its founder, president, and shareholder. (Dkt. 82-1 ¶¶ 1, 3.) Alfred Zurhausen is a German national who has occasionally worked with Belisle to sell boats since approximately 2012. (Dkt. 81 ¶ 16.) Zurhausen's company is Marine Partner Network GmbH & Co KG (MPN). (*Id.* ¶ 23.) In 2021, Mystic Powerboats allowed Belisle to promote the sale of its boats internationally. (*Id.* ¶¶ 4–5.) Accordingly, Mystic Powerboats furnished Marinex International with price lists suggesting retail prices for boats. (*Id.* ¶¶ 10, 15.) In March 2022, Zurhausen asked Belisle about the pricing on Mystic Powerboats' boats, and Belisle got price lists from Cosker, which he sent to Zurhausen. (*Id.* ¶ 17.)

On April 2, 2022, Mystic Powerboats and Marinex International entered into a contract whereby Marinex International bought the boat at issue in this case: a 2023 Mystic 5200. (*Id.* ¶ 8.) Marinex International purchased the boat from Mystic Powerboats for the discounted price of $1,641,449 to resell the boat internationally. (*Id.* ¶¶ 8–9, 11.) Marinex International funded its contractual payments with promissory notes. (*Id.* ¶¶ 13–14.) On October 28, 2022, Budzinski used Zurhausen's

---

[1] In general, the court draws the facts from the parties' joint stipulation of agreed material facts (Dkt. 81).

website to inquire into buying a boat.  (*Id.* ¶ 18.)  Zurhausen confirmed with Belisle that a boat was available, (*id.* ¶ 19), and sent Belisle a price list that had been altered from the version created by Mystic Powerboats, (*id.* ¶ 21).  On November 3, 2022, Budzinski contracted with MPN to buy the boat for $2,590,000.  (*Id.* ¶ 22.)  The next day, MPN received an initial deposit of $1,000,000 for the boat.  (*Id.* ¶ 24.)  Three days after that, on November 7, MPN contracted with Marinex International to buy the boat for $2,100,000 ($2,163,576 with options added).  (*Id.* ¶ 23.)  Over the next two days, MPN wired $800,000 ($500,000 one day plus $300,000 the next) to Marinex International under the November 7 contract.  (*Id.* ¶¶ 25–26.)

On November 21, 2022, Budzinski and Zurhausen visited Mystic Powerboats' factory in DeLand, Florida, to view the boat.  (*Id.* ¶ 27.)  Belisle was not present at this visit, but Cosker was.  (*Id.* ¶¶ 27–28.)  After the visit, MPN gave Budzinski a price list purporting to state pricing for additional options on the boat, and Budzinski began to suspect that Zurhausen had misrepresented the price of the boat to him.  (*Id.* ¶¶ 29–30.)  After Budzinski expressed his concerns to Zurhausen, Zurhausen arranged for Mystic Powerboats to add options to the boat at no cost to Budzinski.  (*Id.* ¶¶ 31–33.)  By early February 2023, Marinex International had finished paying Mystic Powerboats for the boat and had paid a total of $1,774,228 for it including the options.  (*Id.* ¶¶ 38–39.)  As required under his contract with MPN, Budzinski paid MPN $813,000 on December 19, 2022.  (*Id.* ¶ 34.)  The same day, MPN paid Marinex International $500,000 under the November 7 contract.  (*Id.* ¶ 35.)

Budzinski had not communicated with, or even heard of, Marinex International or Belisle until Belisle was copied on a December 21, 2022 email. (*Id.* ¶ 37.) On March 6, 2023, Belisle and Budzinski spoke about the boat. (*See id.* ¶ 40.) According to Budzinski, he called Belisle over the telephone to "understand his involvement" in the sale of the boat, and Belisle told him that the boat was then "selling for" $3,000,000, that Budzinski was getting "a very good deal," that the inflation rate was increasing, and that Belisle could "sell [the boat] tomorrow" to a potential "buyer with" $3,000,000. (Dkt. 82-6 at 12.) Allegedly, when Budzinski responded that Belisle was not making sense because "other people [we]re selling" the same type of boat "for much lower prices," Belisle reassured him that he was "getting a great deal" considering the American inflation rate. (*Id.*) In the days following this telephone conversation, MPN informed Budzinski that he would be in default under his contract with it if he did not pay $770,000 within three working days, and he responded through counsel disputing the default and demanding a refund of the $1,813,000 he had paid at that point. (Dkt. 81 ¶¶ 43–44.)

On May 1, 2023, Marinex International contracted to sell the boat to third party JS Watersports II for $1,500,000. (*Id.* ¶ 46.) When JS Watersports II bought the boat, it arranged (at its own expense) for Mystic Powerboats to repaint the boat. (*Id.* ¶ 50.) That same month, Budzinski sued Zurhausen, MPN, and an MPN affiliate in a German court. (*Id.* ¶ 51.) A month later, in early June 2023, Budzinski initiated this case by moving for a temporary restraining order to enjoin the transfer of the boat to JS Watersports II, (Dkt. 1), and then filed a complaint for injunctive relief and

damages, (Dkt. 5).  The court denied the motion because the relief requested in the complaint, including a refund of the $1,813,000, could adequately remedy Budzinski's injury.  (Dkt. 6.)  On June 7, 2023, Cosker emailed JS Watersports II that "the gentleman who defaulted on the [Mystic] 52[00] overseas" had requested "a temporary restraining order on the boat."  (Dkt. 81 ¶ 53.)

On May 31, 2024, the German court entered judgment against MPN and its affiliate but denied judgment against Zurhausen personally.  (*Id.* ¶ 55.)  On October 1, 2024, Budzinski filed the operative third amended complaint in this case.  (Dkt. 70.)  In it, he brings seven counts against Defendants:  FDUTPA violations against all Defendants (counts one and two), unjust enrichment and money had and received against Marinex International and Belisle (counts three and four), negligent selection and supervision of independent contractors against all Defendants (counts five and six), and libel against Cosker (count seven).  (*Id.* ¶¶ 154–200.)  The complaint contains but one ad damnum clause, which appears at the end and presumably states the relief pursued through each count.  (*See id.*)  In the clause, Budzinski requests injunctive relief requiring Defendants to furnish him with the boat in accordance with his purchase agreement, as well as monetary damages encompassing the actual damages and legal fees he incurred and punitive damages.  (*Id.* at 35.)  Budzinski also asks for "statutory damages and penalties as provided by FDUTPA."  (*Id.*)  In a cross-claim, Mystic Powerboats and Cosker sue Marinex International for indemnification pursuant to the terms of the contract under which Mystic Powerboats sold the boat to Marinex International.  (Dkt. 38 at 14–15; *see* Dkt. 5-7 at 12.)

## APPLICABLE STANDARDS

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."  *Id.*  The party seeking summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials" when resolving the motion.  Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.*  The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the moving party shows that no evidence supports the non-moving

party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

## ANALYSIS

Because the court sits in diversity jurisdiction, Florida substantive law applies.

- 7 -

*Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023). "Where the Supreme Court of Florida has not addressed a particular issue, federal courts are . . . bound by the decisions of the Florida district courts of appeal that address the disputed issue, unless there is an indication that the supreme court would not adhere to the district court's decision." *Geary Distrib. Co. v. All Brand Imps., Inc.*, 931 F.2d 1431, 1434 (11th Cir. 1991). In applying Florida substantive law, the court examines Budzinski's FDUTPA claims, claims of unjust enrichment and money had and received, claims of negligent selection and supervision of independent contractors, and libel claim. The court then considers Mystic Powerboats and Cosker's indemnification cross-claim against Marinex International.

### 1. FDUTPA

FDUTPA makes "unlawful" "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "[C]overage [under FDUTPA] is 'extremely broad.'" *Harris v. Nordyne, LLC*, No. 14-CIV-21884-BLOOM/Valle, 2014 WL 12516076, at *6, 2014 U.S. Dist. LEXIS 189248, at *15 (S.D. Fla. Nov. 14, 2014) (quoting *Citibank (S.D.) N.A. v. Nat'l Arb. Council, Inc.*, Nos. 3:04-cv-1076-J-32MCR, 3:04-cv-1205-J-20MCR, 2006 WL 2691528, at *3, 2006 U.S. Dist. LEXIS 67133, at *11 (M.D. Fla. Sept. 19, 2006)). FDUTPA defines "[t]rade or commerce" expansively as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla.

Stat. § 501.203(8). This definition encompasses "the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." *Id.* Moreover, FDUTPA applies to even a single deceptive or unfair act "involv[ing] only a single party, a single transaction, or a single contract." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). "[A]nyone aggrieved by a violation of [FDUTPA] may bring an action to obtain a declaratory judgment that an act or practice violates [FDUTPA] and to enjoin a person who has violated, is violating, or is otherwise likely to violate [FDUTPA]." Fla. Stat. § 501.211(1). Additionally, "a person who has suffered a loss as a result of a [FDUTPA] violation . . . may recover actual damages, plus attorney[] fees and court costs," in an action. *Id.* § 501.211(2).

The elements of a FDUTPA claim are "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages or aggrievement." *Third Party Verification, Inc. v. SignatureLink, Inc.*, 492 F. Supp. 2d 1314, 1326 (M.D. Fla. 2007), *report and recommendation adopted by* 492 F. Supp. 2d at 1319. An act is "deceptive" if it is "'likely to mislead' consumers." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000)). A practice is "unfair" if it "offends established public policy" and is "immoral, unethical, oppressive, unscrupulous[,] or substantially injurious to consumers." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR*, 842 So. 2d at 777); *Bechor v. Simcenter, Inc.*, 394 So. 3d 666, 669 (Fla. Dist. Ct. App.

2024) (quoting same); *contra Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1092, 1096 (Fla. Dist. Ct. App. 2014) (rejecting this definition of "unfairness" as "outdated" and applying a "three-pronged test" instead). "Whether particular conduct constitutes . . . an unfair or deceptive trade practice [under FDUTPA] is a question of fact" for the jury. *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009) (citing *Suris v. Gilmore Liquidating, Inc.*, 651 So. 2d 1282, 1283 (Fla. Dist. Ct. App. 1995)). "To decide whether a FDUTPA violation has occurred, [the jury] must evaluate [the] entire consumer transaction, taking into consideration all of the parties' dealings . . . ." *Dorestin v. Hollywood Imps., Inc.*, 45 So. 3d 819, 831 (Fla. Dist. Ct. App. 2010) (Gross, C.J., concurring specially). To hold a corporate officer individually liable under FDUTPA, the plaintiff must show that the officer "was a direct participant in the [allegedly] improper dealings." *Bechor*, 394 So. 3d at 669 (quoting *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. Dist. Ct. App. 2008)).

Budzinski alleges that Defendants violated FDUTPA in eight ways—the first five associated with the general nature of the sale of the boat and the last three tied to specific events. First, Defendants employed Zurhausen in the sale of the boat even though they knew or should have known that he was "likely to engage in deceptive and unfair sales practices on their behalf." (Dkt. 70 ¶¶ 158a, 165a.) Second, Defendants used "a complex multi-party contractual arrangement" to avoid liability and obscure ownership and value related to the boat. (*Id.* ¶¶ 158b–d, 165 b–d.) Third, Defendants "[f]acilitat[ed] the overcharging of" Budzinski. (*Id.* ¶¶ 158e, 165e.) Fourth, Marinex International and Belisle took Budzinski's money and gave him

"nothing of value in return." (*Id.* ¶ 158f.)  Fifth, Defendants sold, or facilitated the sale of, the boat to JS Watersports II even though they knew that Budzinski had an interest in the boat.  (*Id.* ¶¶ 158g, 165f.)  Sixth, Defendants failed to disclose information to Budzinski in November 2022, January 2023, and February 2023.  (*Id.* ¶¶ 157a, e–g, 164a, e–i.)   Specifically, during Budzinski's November 2022 visit to Mystic Powerboats' facilities, Defendants failed to disclose to Budzinski the price paid for the boat and failed to inform him that Zurhausen was not an agent for Mystic Powerboats, that Mystic Powerboats had sold the boat to Marinex International, and that the boat "would transfer through Marinex [International] to MPN and only then to" Budzinski.  (*Id.* ¶¶ 157a, 164a.)  Further, during conversations in January and February 2023, Defendants failed to share with Budzinski Cosker's opinion that in Zurhausen's transaction with Budzinski, Zurhausen "had engaged in 'criminal' conduct . . . 'reek[ing] of greed,'" and they failed to inform Budzinski that Cosker "had chastised Belisle for selecting and retaining Zurhausen as a representative" and "ordered Belisle to keep a closer eye on Zurhausen's dealings," that Belisle "had chastised Zurhausen for unethical business conduct," and that Marinex International had purchased the boat from Mystic Powerboats.  (*Id.* ¶¶ 157e–g, 164e–i.)  Seventh, during the March 2023 telephone call, Belisle misrepresented to Budzinski that Budzinski "had gotten a 'great deal'" on the boat and that Belisle "had other interested buyers who would have willingly paid" $3,000,000 for the boat.  (*Id.* ¶¶ 108–11, 156.)  Eighth, in the June 2023 email, Cosker misrepresented to JS Watersports II the reason that Budzinski had not completed the transaction to buy the boat.  (*Id.* ¶¶ 135–36, 163,

195.)  The court addresses these eight ways in turn.  The court then examines Mystic Powerboats and Cosker's arguments that Budzinski's damages are too speculative to support his FDUTPA claims and that no evidence establishes Cosker's individual involvement in the alleged misconduct underlying the claims.  (Dkt. 83 at 19–20.)

### a.  Employing Zurhausen

In their motions for summary judgment, Defendants briefly argue that no evidence establishes either Zurhausen's employment with them as an independent contractor or a broker or their knowledge that he was likely to engage in deceptive or unfair practices on their behalf.  (Dkt. 82 at 15; Dkt. 83 at 16.)  The court discusses these arguments below in connection with Budzinski's claims of negligent selection and supervision of independent contractors.  For the reasons explained below, the court rejects the arguments.

### b.  Using the Complex Contractual Arrangement

Defendants dispute that the structure of the contractual arrangement is deceptively or unfairly complex and challenge Budzinski's characterization of it as such by stating that the characterization lacks a basis in fact and by pointing to Budzinski's status as a sophisticated boat buyer.  (Dkt. 82 at 15–16; Dkt. 83 at 16–17.)  Defendants' motions do not support their assertions in this regard with necessary legal authorities.  (*See* Dkt. 82 at 15–16; Dkt. 83 at 16–17.)  *See United States v. Markovich*, 95 F.4th 1367, 1379 (11th Cir. 2024) (holding that a party forfeited its position when it "cite[d] no legal authority to support it").  Moreover, the court previously determined that the structure of the contractual arrangement could support a FDUTPA claim, (*see*

Dkt. 69 at 37–38), and in so doing, the court noted that the deceptive or unfair nature of conduct under FDUTPA is often a question of fact, (*id.* (citing *Suris*, 651 So. 2d at 1283)). Because Defendants have not given the court a legally supported reason to remove the factual issue from the jury's consideration, the court denies their motions as to the FDUTPA claims based on the structure of the contractual arrangement.

### c. Facilitating the Overcharging of Budzinski

According to Defendants, the record does not support that they facilitated the overcharging of Budzinski because he negotiated the price of the boat with MPN without their input or involvement and because he suspected that he had been overcharged before he made his second payment to MPN. (Dkt. 82 at 16–18; Dkt. 83 at 17–18.) The latter contention is unpersuasive because Defendants do not offer legal authorities for it and do not otherwise explain how Budzinski's suspicion defeats these FDUTPA claims. (*See* Dkt. 83 at 18.) *See Markovich*, 95 F.4th at 1379. As to the former contention, Budzinski responds that the record would allow a reasonable jury to find that Defendants not only "partnered with" Zurhausen despite his history of unethical business practices—and even equipped him with "a price list that gave him a deceptive credibility"—but also "hid the true price" of the boat, and thus, the record supports the alleged facilitation. (Dkt. 88 at 15–16.) Viewing the record in the light most favorable to Budzinski, a reasonable jury could conclude that Defendants facilitated the overcharging in these ways. Accordingly, the court denies summary judgment on this issue.

### d.  Taking Budzinski's Money and Giving Nothing of Value in Return

Marinex International and Belisle contend—without citing any legal authority, *see Markovich*, 95 F.4th at 1379—that "there is no evidence that [they] took any money at all from Budzinski." (Dkt. 82 at 18–19.)  However, as Budzinski observes, "[w]ithin days of [his] paying separate deposits of [$1,000,000] and $813,000 to MPN, MPN transferred $800,000 and $500,000 to Marinex" International. (Dkt. 88 at 16; *see* Dkt. 81 ¶¶ 24–26, 34–35.)  This closeness in time supports that $800,000 of the $1,000,000 and $500,000 of the $813,000 went to Marinex International and Belisle. *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1346 n.6 (11th Cir. 2008) (finding "evidence from which the jury could" conclude that notes corresponded to bank transfers when "the notes were dated to appear close in time to the transfers"), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).  Further, Belisle admitted during his deposition that it would have been reasonable to assume that the $500,000 paid to Marinex International came from Budzinski. (Dkt. 85-1 at 31.)  Because a reasonable jury viewing the evidence in the light most favorable to Budzinski could determine that Marinex International and Belisle ended up in possession of Budzinski's money, the court denies summary judgment on this issue.

### e.  Selling the Boat Despite Knowing of Budzinski's Interest in It

Defendants assert that "[t]here is no evidence that Budzinski ever acquired an ownership interest" in the boat. (Dkt. 82 at 19; *accord* Dkt. 83 at 18.)  In response,

Budzinski states: "[T]he question is not the extent of [his] legal interest in the [boat;] rather, the question is whether it was unfair or deceptive for . . . Defendants to help resell the [boat] to a third party[] when they knew that their [agents] had taken [$1,813,000] from [him] for that [boat]." (Dkt. 89 at 17 (internal quotation marks omitted).) In this lawsuit, Budzinski has alleged numerous FDUTPA theories and other claims in line with this general theme. (*See* Dkt. 70.) However, the specific theory at issue is that Defendants sold, or facilitated the sale of, the boat "to another party despite actual knowledge of [his] interest in" it. (*Id.* ¶¶ 158g, 165f.) Budzinski's legal interest in the boat matters because the theory relies on it and on Defendants' actual knowledge of it. (*See id.*) Although a plaintiff is "the master of the complaint" in that he "selects the claims that will be alleged" therein, *United States v. Jones*, 125 F.3d 1418, 1428 (11th Cir. 1997), he "may not amend [his] complaint through argument in a brief opposing summary judgment," *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). At this stage, Budzinski bears the burden of "identify[ing] affirmative evidence" as to his interest in the boat and Defendants' actual knowledge thereof, *see Crawford-El*, 523 U.S. at 600, but he does not satisfy that burden, (*see* Dkts. 88, 89). Consequently, Defendants are entitled to summary judgment with respect to this FDUTPA theory.

### f.  Failing to Disclose Information

Regarding the failure to disclose information to Budzinski, Defendants mainly argue that they did not owe Budzinski a duty to disclose under Florida law. (Dkt. 82 at 12–15; Dkt. 83 at 13–14.) However, as the court explained in a prior order, (Dkt.

69 at 29), it "is not clear whether [a] plaintiff[] must establish an independent duty to disclose on a FDUTPA claim based on an omission affirmatively used to mislead," *Coffey v. WCW & Air, Inc.*, No. 3:17-cv-90-MCR-CJK, 2018 WL 4154256, at *4, 2018 U.S. Dist. LEXIS 148122, at *11 (N.D. Fla. Aug. 30, 2018). *Compare White v. Grant Mason Holdings, Inc.*, 741 F. App'x 631, 637 n.1 (11th Cir. 2018) ("[The defendant] makes no suggestion that Florida's general law on the duty to disclose differs in the FDUTPA context, and [the court is] not aware of any reason those doctrines should differ."), *with Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012) (declining to decide whether a duty to disclose is an element of a FDUTPA count but concluding that the FDUTPA count at issue was properly dismissed for failure to state a claim because the count was predicated solely on the breach of an "affirmative duty of disclosure"), *and Morris v. ADT Sec. Servs.*, 580 F. Supp. 2d 1305, 1310 (S.D. Fla. 2008) (determining that "a duty to disclose is not an element of FDUTPA" because Florida law requires FDUTPA to "be construed liberally" to protect the public from deceptive and unfair business practices (quoting Fla. Stat. § 501.202(2))).

FDUTPA instructs courts to construe its prohibition on "unfair or deceptive acts or practices" by affording "due consideration and great weight . . . to the interpretations of the Federal Trade Commission [(FTC)] and the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act [(FTCA)] . . . as of July 1, 2017." Fla. Stat. § 501.204. This instruction makes sense in light of the statutes' similar language. *Compare id.* § 501.204(1) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

conduct of any trade or commerce are hereby declared unlawful."), *with* 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."). When examining the FTC's authority to determine the unfairness of commercial conduct under section 5(a) of the FTCA, the Supreme Court explained: "[T]he [FTC] does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws." *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).  The Seventh Circuit described this case as recognizing the FTC's "authority to prohibit conduct that, although legally proper, was unfair to the public" and more broadly noted that "[a] business practice which is not in violation of the common law or the criminal statutes may still be prohibited if it is contrary to public policy." *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 292, 295 n.10 (7th Cir. 1976). Given this guidance, this court agrees with the *Morris* court that the duty to disclose required for common law fraud claims, *see TransPetrol, Ltd. v. Radulovic*, 764 So. 2d 878, 879–80 (Fla. Dist. Ct. App. 2000), is not an element of a FDUTPA claim based on an omission.  *See* 580 F. Supp. 2d at 1310.  This outcome finds support in another "critical difference" between FDUTPA and fraud claims: whereas a party asserting a fraud claim must establish reliance, a "party asserting a [FDUTPA] claim need not show actual reliance on the representation or omission at issue." *Davis*, 776 So. 2d at 973.  Accordingly, the court rejects Defendants' arguments as to the duty to disclose.

Mystic Powerboats and Cosker additionally maintain that the alleged nondisclosures did not cause Budzinski damages cognizable under FDUTPA because the November 2022 factory visit and January and February 2023 conversations occurred after Budzinski's contract with MPN and the first payment made under that contract. (Dkt. 83 at 15.) Budzinski responds that he was damaged when Mystic Powerboats and Cosker assisted Marinex International and Belisle in "transfer[ring] ownership of the [boat] to JS Watersports" II, which happened after the visit and conversations, because this conduct kept Budzinski from the boat for which he had paid. (Dkt. 89 at 11–12.) Because a reasonable jury viewing the evidence in the light most favorable to Budzinski could agree with him, Mystic Powerboats and Cosker are not entitled to summary judgment on the FDUTPA claims related to nondisclosure.

### g. Belisle's March 2023 Statements to Budzinski

Marinex International and Belisle assert that Belisle's March 2023 statements about the boat's value and the great deal that Budzinski had gotten are inactionable puffery rather than deceptive or unfair practices. (Dkt. 82 at 11.) Budzinski counters: "[W]hile . . . Belisle's purported statement that . . . Budzinski was getting a great deal might be construed as a statement of opinion, his alleged factual statement—that he had a buyer willing to pay [$3,000,000] for the [boat]—was not puffery at all." (Dkt. 88 at 9 (internal quotation marks and emphasis omitted).) As Budzinski all but admits, even in the light most favorable to him, the statement about the great deal he had gotten is inactionable puffery. *See Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1342–43 (S.D. Fla. 2011) (deeming inactionable puffery statements that a

loan was a "good deal" for the plaintiff); *see also Perret v. Wyndham Vacation Resorts, Inc.*, 889 F. Supp. 2d 1333, 1341–42 (S.D. Fla. 2012) (in a timeshare case, dismissing a FDUTPA count with prejudice because the relied-on misrepresentations—"that the purchase price for the timeshare was reasonable, that the units were worth more than what [a defendant] was charging for them, that [the d]efendants' management and maintenance fees were reasonable, and that the units were desirable"—were "nothing more than opinion or puffery"). Consequently, Marinex International and Belisle are entitled to summary judgment as to this statement. However, the statement that Belisle had another interested buyer who would have paid $3,000,000 for the boat is not puffery but a verifiable factual assertion. *See United States v. Martinelli*, 454 F.3d 1300, 1317 (11th Cir. 2006) (contrasting the puffery of "exaggerated opinions or hyped-up sales pitches" with "verifiably refutable" "factual statements").

In their motion, Marinex International and Belisle argue that the statement about another buyer is insufficient to support a FDUTPA claim for two additional reasons, (Dkt. 82 at 12), but neither reason persuades. First, these Defendants quote *Chicken Unlimited, Inc. v. Bockover*, 374 So. 2d 96, 97 (Fla. Dist. Ct. App. 1979)—and only that case—for the proposition that "a plaintiff cannot prove FDUTPA causation if the evidence shows [that] the plaintiff actually 'knew of the possible falsity of those statements which he later claimed were misrepresentations.'" (Dkt. 82 at 12 (alteration adopted).) However, *Chicken Unlimited* does not support that proposition. *See* 374 So. 2d at 97. Rather, the case confirms that where "competent substantial evidence" allows a jury to decide that a FDUTPA plaintiff "knew of the possible falsity

- 19 -

of those statements . . . which he later claimed were misrepresentations[,] . . . the jury [i]s entitled"—not required—"to find that the[] alleged misrepresentations were not the cause of any damages." *Id.* Second, Marinex International and Belisle contend, the March 2023 statements could not have harmed Budzinski because Belisle made them months after Budzinski paid MPN. (Dkt. 82 at 12.) This contention is unsupported by caselaw, (*see id.*), and in any event, the court agrees with Budzinski that "[t]here is at least a question of fact on whether [he] was harmed by" what a reasonable jury could find to be Defendants' "stalling tactics" related to keeping the boat from him, (Dkt. 88 at 11–12; *see* Dkt. 82-6 at 12). *See Markovich*, 95 F.4th at 1379; *Yvon v. Baja Marine Corp.*, 495 F. Supp. 2d 1179, 1184–85 (N.D. Fla. 2007) (holding that a FDUTPA count stated a claim for relief when the alleged violations "involved [the] defendants' 'stalling' and attempting 'to avoid their obligation' to [the] plaintiffs" (alteration adopted)). Therefore, with respect to the March 2023 statements, the court grants summary judgment only as to the statement about Budzinski's great deal.

### h. Cosker's June 2023 email to JS Watersports II

Mystic Powerboats and Cosker maintain that any misrepresentations in his June 2023 email to JS Watersports II could not have caused Budzinski damages under FDUTPA because the email was sent after Budzinski's contract with MPN, after the payments made under that contract, and after Marinex International's sale of the boat to JS Watersports II. (Dkt. 83 at 12–13.) This argument is essentially the same as the unavailing nondisclosure argument advanced by Mystic Powerboats and Cosker, (*see id.* at 15), and it fails for the same reason, discussed above.

### i. Speculative Damages

In their motion for summary judgment against Budzinski, Mystic Powerboats and Cosker cite two non-binding cases to support that Budzinski's alleged damages are too speculative to sustain a FDUTPA claim because Mystic Powerboats and Cosker did not set the price that Budzinski paid for the boat. (Dkt. 83 at 19–20.) *See Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290; *Knowles v. McDonald's USA, LLC*, No. 16-81657-CIV-MARRA, 2018 WL 8244277, at *5, 2018 U.S. Dist. LEXIS 232744, at *12–13 (S.D. Fla. Feb. 9, 2018). These cases are distinguishable from this case on the basis of the key business relationships involved. *Lombardo* dealt with an undisputed manufacturer-retailer relationship between the defendants, who made, distributed, marketed, and sold sunscreens, and retailers like the Walmart department store/supermarket where the plaintiff bought sunscreens. 124 F. Supp. 3d at 1284–85. *Knowles* dealt with an undisputed fast-food franchisor-franchisee relationship. 2018 WL 8244277, at *5, 2018 U.S. Dist. LEXIS 232744, at *12–13. In contrast, as the court addresses below in connection with Budzinski's claims of negligent selection and supervision of independent contractors, the business relationships in this case are disputed: although Defendants argue otherwise, a reasonable jury could find independent contractor relationships. Moreover, in response to the speculative damages argument, Budzinski states that he "has never argued that [Mystic Powerboats and Cosker] set MPN's price[; r]ather, [they] participated in a broader scheme that allowed the true price, the real buyer, and the parties' relationships to be hidden." (Dkt. 89 at 17.) Because a reasonable jury could

agree with Budzinski on this point, Mystic Powerboats and Cosker are not entitled to summary judgment based on their speculative damages argument.

### j.  Cosker's Individual Involvement

Cosker requests that the court grant summary judgment as to the FDUTPA claims against him individually because, "[o]ther than a single statement to JS Watersports [II] made after this lawsuit was filed," no evidence supports that he was "involved in any of the actions underlying" the FDUTPA claims.  (Dkt. 83 at 20.)  *See Bechor*, 394 So. 3d at 669.  Because the FDUTPA claims based on Cosker's June 2023 email have not been dismissed, Cosker's single statement suffices to establish his individual involvement such that the court must deny his request.  *See PNR*, 842 So. 2d at 777.

### 2.  Unjust Enrichment and Money Had and Received

Budzinski sues Marinex International and Belisle for unjust enrichment and money had and received under the theory that these Defendants have benefited from $1,300,000 of the funds that he paid for the boat but have not delivered the boat to him.  (Dkt. 70 ¶¶ 168–77.)  In Florida, claims of unjust enrichment and money had and received have the same elements: "(1) [the plaintiff] conferred a benefit on the [defendant,] (2) the [defendant] appreciated [the] benefit[,] and (3) acceptance and retention of [the] benefit by the [defendant] under the circumstances would be inequitable without [the defendant] paying for [the benefit]."  *Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1384 (S.D. Fla. 2009) (citing *Challenge Air Transp.,*

*Inc. v. Transportes Aereos Nacionales, S.A.*, 520 So. 2d 323, 324 (Fla. Dist. Ct. App. 1988);

*Moore Handley, Inc. v. Major Realty Corp.*, 340 So. 2d 1238, 1239 (Fla. Dist. Ct. App.

1976)); *accord Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1317 n.13 (11th Cir. 2021)

("Under Florida law, money had and received is synonymous with unjust

enrichment . . . ." (internal quotation marks omitted)).

     The first element requires the plaintiff to "directly confer a benefit to the

defendant." *Marrache*, 17 F.4th at 1101 (quoting *Kopel v. Kopel*, 229 So. 3d 812, 818

(Fla. 2017)). However, a plaintiff may directly confer a benefit to a defendant through

an intermediary, as "it would not serve the principles of justice and equity to preclude

an unjust enrichment claim merely because the benefit passed through an intermediary

before being conferred on a defendant." *Cape, LLC v. Och-Ziff Real Est. Acquisitions LP*,

370 So. 3d 1010, 1017 (Fla. Dist. Ct. App. 2023) (cleaned up); *accord Tooltrend, Inc. v.

CMT Utensili, SRL*, 198 F.3d 802, 806 (11th Cir. 1999) ("Florida courts have made

clear that an unjust enrichment claim may be brought whether or not the parties had

any previous contact at all." (citing *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting

Co.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997))); *Shelor v. Jaguar Land Rover N. Am.

LLC*, No. 3:23-cv-908-WGY-PDB, 2025 U.S. Dist. LEXIS 19700, at *134 (M.D. Fla.

Jan. 31, 2025) (in a report and recommendation, analyzing unjust enrichment cases

from Florida appellate courts and "predict[ing that] the Florida Supreme Court would

hold that a plaintiff may directly confer a benefit on a defendant through an

intermediary" provided that the benefit is "fully and directly traceable from the

plaintiff to the defendant" (internal quotation marks omitted)).

When a company is unjustly enriched, an individual's position within the company, standing alone, is insufficient to satisfy the first element for an unjust enrichment claim against the individual. *See SIG, Inc. v. AT&T Digit. Life, Inc.*, 971 F. Supp. 2d 1178, 1192 (S.D. Fla. 2013) ("[T]he benefits [the p]laintiffs allegedly conferred . . . were all bestowed on [the corporation], as they relate[d] to the marketing, selling, installing, and servicing of [the corporation's] products and the building of [the corporation]'s brand. . . . [A]ny benefits the [individual defendants] would have received would have been derived indirectly by virtue of their role[s] in the corporation . . . ."); *Alt. Materials, LLC v. Monroe*, No. 5:20-cv-239-AW/MJF, 2023 WL 2410928, at *7, 2023 U.S. Dist. LEXIS 38650, at *17 (N.D. Fla. Jan. 23, 2023) ("Merely demonstrating that a defendant was a director, officer, or shareholder of a corporation that was unjustly enriched is insufficient . . . ."), *report and recommendation adopted by Alt. Materials, LLC v. TCH Constr. Grp., Inc.*, No. 5:20-cv-239-AW-MJF, 2023 WL 2403777, at *1, 2023 U.S. Dist. LEXIS 38352, at *1 (N.D. Fla. Mar. 8, 2023). Also, typically in the unjust enrichment context, when a defendant cashes a plaintiff's check and retains the resulting funds, the plaintiff confers a benefit on the defendant in the form of the funds and the defendant appreciates this benefit. *See Encore Enters. v. Roberts Hotels Fort Myers, LLC*, No. 2:09-CV-118-FTM-36SPC, 2011 WL 5357533, at *4, 2011 U.S. Dist. LEXIS 125618, at *9 (M.D. Fla. Oct. 31, 2011) (holding that the defendant received a benefit when it cashed a check for $160,169.74 and that it appreciated the benefit because it retained the funds); *Reliastar Life Ins. Co. v. Kiel*, No. 3:08-cv-751-J-34MCR, 2010 WL 11507705, at *3–4, 2010 U.S. Dist. LEXIS 149252,

at *8–10 (M.D. Fla. July 29, 2010) (granting summary judgment on an unjust enrichment claim to the plaintiff when the defendant "received a check for $149,576.89 from [the p]laintiff, which [the defendant] subsequently cashed," and the defendant "refused to return the funds" to the plaintiff).

Budzinski maintains that he is entitled to summary judgment on his claims of unjust enrichment and money had and received because it "would be utterly inequitable to permit" Marinex International and Belisle to benefit from his money "where they provided nothing of value in exchange for it." (Dkt. 85 at 8–9.) In Budzinski's words, these "Defendants' creative employment of [MPN as] an intermediary does not render them immune from suit for their unjust enrichment." (Dkt. 93 at 5.) However, in his opposition to Marinex International and Belisle's motion, Budzinski also argues that issues of material fact preclude summary judgment on the claims. (*See* Dkt. 88 at 19.) For their part, Marinex International and Belisle contend that they are entitled to summary judgment on the claims because Budzinski did not directly confer a benefit on them when he paid MPN and because they "had no knowledge of any benefit from" him. (Dkt. 82 at 23–25 (emphasis omitted); *accord* Dkt. 92 at 6–7 (focusing on the direct conferral requirement).) However, in opposing Budzinski's motion, Marinex International and Belisle list factual disputes allegedly barring summary judgment. (Dkt. 87 at 17.)

Given the factual disputes remaining in this case, summary judgment as to the claims of unjust enrichment and money had and received is improper. Marinex International and Belisle are not entitled to summary judgment because a reasonable

jury could find in Budzinski's favor.  Belisle's deposition testimony supports that Marinex International and Belisle knew that money was passing from Budzinski through MPN to Marinex International for the boat.  (*See* Dkt. 93 at 1–3 (citing Dkt. 93-1).)  Based on this testimony and other record evidence regarding payments made, (*e.g.*, Dkt. 81 ¶¶ 22–26, 34–36), a reasonable jury could find that Budzinski directly conferred a benefit to Marinex International through MPN.  *See Tooltrend, Inc.*, 198 F.3d at 806; *Cape, LLC*, 370 So. 3d at 1017.  Further, although Belisle's position within Marinex International in and of itself would not satisfy the claims' direct conferral requirement, *see SIG, Inc.*, 971 F. Supp. 2d at 1192; *Alt. Materials, LLC*, 2023 WL 2410928, at *7, 2023 U.S. Dist. LEXIS 38650, at *17, Belisle's deposition testimony supports that he benefited from the money not merely as an officer of the company but as the signer of a promissory note that personally indebted him regarding the purchase of the boat, (*see* Dkt. 93 at 3–4 (citing Dkt. 85-1 at 18–19)).  A reasonable jury could determine that Budzinski directly conferred a benefit to Belisle in the form of money with which Belisle could pay down this personal debt.  *See Agritrade, LP v. Quercia*, 253 So. 3d 28, 33 (Fla. Dist. Ct. App. 2017) (concluding that a plaintiff "clearly conferred a benefit on" a defendant when the defendant used the plaintiff's money to pay down a loan).

In addition, a reasonable jury could conclude that the claims' other elements are met.  A reasonable jury could find that Marinex International and Belisle appreciated the benefit of Budzinski's money because they retained the money.  *Cf. Encore Enters.*, 2011 WL 5357533, at *4, 2011 U.S. Dist. LEXIS 125618, at *9;

- 26 -

*Reliastar*, 2010 WL 11507705, at *3–4, 2010 U.S. Dist. LEXIS 149252, at *8–10. Moreover, a reasonable jury could deem it inequitable under the circumstances for Marinex International and Belisle to keep the money, which Budzinski paid for the boat, without giving Budzinski the boat. *See Hikmatullaev v. Villa*, No. 23-cv-22338-ALTMAN/REID, 2023 WL 4373225, at *2, 2023 U.S. Dist. LEXIS 111619, at *6 (S.D. Fla. June 28, 2023) ("[The p]laintiffs have proffered evidence demonstrating that they transferred $812,086 [United States Dollar Tokens (USDT)] to [the d]efendants in exchange for [a w]atch.  [The p]laintiffs have alleged that despite this payment[,] they never received the [w]atch or a refund for the $812,086 USDT [that a defendant] retained.  These facts establish a prima facie case for . . . unjust enrichment."), *report and recommendation adopted by* 2023 WL 4363566, at *1, 2023 U.S. Dist. LEXIS 116139, at *3 (S.D. Fla. July 6, 2023).

Alternatively, a reasonable jury could find in favor of Marinex International and Belisle.  For example, a reasonable jury could determine from the business relationships between Budzinski, MPN, and Marinex International that Budzinski did not directly confer a benefit to Marinex International or Belisle when Budzinski paid MPN.  *Cf. Marrache*, 17 F.4th at 1102 (affirming the dismissal of customers' unjust enrichment claims against a gin producer when the customers bought the gin from a supermarket because the customers directly conferred a benefit on the supermarket, not on the gin producer).  Accordingly, Budzinski is not entitled to summary judgment on his claims of unjust enrichment and money had and received, and in general, summary judgment concerning these claims is denied.

### 3. Negligent Selection and Supervision of Independent Contractors

Florida law recognizes a cause of action against "the employer of an independent contractor" for "negligence in selecting, instructing, or supervising the contractor." *McCall v. Ala. Bruno's, Inc.*, 647 So. 2d 175, 177 (Fla. Dist. Ct. App. 1994); *accord Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1270 (11th Cir. 2023) ("Florida law . . . recognizes an action for negligent selection of an independent contractor, which may be brought against a principal who fails to exercise reasonable care to employ a competent and careful contractor." (alteration adopted and quotations omitted)). "[A]n independent contractor is one who, in the exercise of an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer except as to the product or result of his work." *Wilson v. Sandstrom*, 317 So. 2d 732, 739 (Fla. 1975) (quotation omitted), *superseded by statute on other grounds as stated in Cole v. Wells Fargo Bank Nat'l Ass'n*, 201 So. 3d 749, 750 n.1 (Fla. Dist. Ct. App. 2016). Negligent selection of an independent contractor has three elements: "(1) the contractor was incompetent or unfit to perform the work[,] (2) the employer knew or reasonably should have known of the particular incompetence or unfitness[,] and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury." *Davies v. Com. Metals Co.*, 46 So. 3d 71, 73–74 (Fla. Dist. Ct. App. 2010). Insofar as Budzinski brings negligent supervision claims distinct from negligent selection claims, the parties agree that all the independent contractor claims have these three elements. (*See* Dkt. 82 at 21 & n.34; Dkt. 83 at 21 & n.26; Dkt. 88 at 16–17; Dkt. 89 at 19.) Because the law does not

compel a different conclusion, the court analyzes all the independent contractor claims in light of these elements.

Defendants make three arguments for summary judgment on the independent contractor claims. (Dkt. 82 at 21–23; Dkt. 83 at 21–23; Dkt. 91 at 5–6; Dkt. 92 at 4–6.)[2]  First, according to Defendants, no reasonable jury could conclude from the summary judgment record that MPN or Zurhausen was an independent contractor working for Marinex International or Belisle; that Marinex International, Belisle, MPN, or Zurhausen was an independent contractor working for Mystic Powerboats or Cosker; that Marinex International, Belisle, MPN, or Zurhausen was incompetent or unfit by virtue of engaging in deceptive and unfair trade practices, such as fraud; or that any Defendant knew or should have known of the alleged incompetence or unfitness of its independent contractors.  (Dkt. 82 at 21–22; Dkt. 83 at 21–23; Dkt. 91 at 5–6; Dkt. 92 at 5.)  Second, Belisle and Cosker argue, their lack of involvement in the purported misconduct means that Budzinski cannot establish the knowledge

---

[2] Although Budzinski in his response, (Dkt. 89 at 19–20), and Mystic Powerboats and Cosker in their reply, (Dkt. 91 at 6 n.21), discuss whether Florida law requires physical harm for claims of negligent selection and supervision of independent contractors, Mystic Powerboats and Cosker explicitly "assume for purposes of" their summary judgment motion "that Florida law . . . recognize[s] a claim for negligent selection or supervision of an independent contractor in the absence of physical harm," (Dkt. 83 at 21 n.25).  Therefore, the court does not consider an argument related to a physical harm requirement.  *See United States v. Batmasian*, 66 F.4th 1278, 1281 (11th Cir. 2023) (declining to address a jurisdictional issue related to an argument that the moving party "expressly disclaim[ed]"); *cf. Quinlan v. Sec'y, U.S. Dep't of Lab.*, 812 F.3d 832, 837 (11th Cir. 2016) (applying a legal test that the parties assumed in their briefs applied).  In any event, there is authority against a physical harm requirement.  *See Van Vechten v. Elenson*, 920 F. Supp. 2d 1284, 1295 (S.D. Fla. 2013) ("[T]his [c]ourt does not agree that Florida requires 'physical harm' as a prerequisite to liability for negligent selection.").  Furthermore, to the extent that Defendants raise any arguments for the first time in their replies, (*see* Dkts. 91, 92), the court disregards such arguments, *see United States v. Montenegro*, 1 F.4th 940, 944 n.3 (11th Cir. 2021) ("[Courts] do not consider arguments presented for the first time in . . . reply brief[s].").

required under Florida law to hold corporate officers liable through negligent employment claims.  (Dkt. 82 at 22 n.35; Dkt. 83 at 23.)  Third, Defendants invoke the doctrine of collateral estoppel and contend that the judgment entered by the German court precludes Budzinski from claiming that MPN or Zurhausen's incompetence or unfitness harmed him.  (Dkt. 82 at 23; Dkt. 83 at 22–23; Dkt. 91 at 6; Dkt. 92 at 6.)  The court rejects all three arguments.

As to the first argument, Defendants assert that no evidence supports an independent contractor relationship, their contracts disclaim such a relationship, and no evidence shows that they knew or should have known of their independent contractors' incompetence or unfitness.  (Dkt. 82 at 21–23; Dkt. 83 at 21–23.)  These assertions are unavailing.  To begin with, under Florida law, real estate brokers act as independent contractors for homeowners selling homes, *Smith v. Mayes*, 851 So. 2d 785, 786 (Fla. Dist. Ct. App. 2003), and the court agrees with Budzinski, (*see* Dkt. 89 at 18), that by analogy, a reasonable jury viewing the record in the light most favorable to him could find the necessary independent contractor relationships to hold Defendants liable for negligent selection and supervision.  (*See, e.g.*, Dkt. 81 ¶¶ 1–11, 16–17, 19, 23, 25–29, 32–33, 35–36, 38–39, 41–42, 46, 50.)  Further, Defendants cannot disclaim independent contractor relationships by contract in contradiction to facts supporting those relationships because "the nature and extent of the relationship of parties with regard to agency presents a question of fact and is not controlled by descriptive labels employed by the parties" in contracts.  *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 854 (Fla. 2003) (describing the holding of *Parker v.*

*Domino's Pizza, Inc.*, 629 So. 2d 1026, 1027 (Fla. Dist. Ct. App. 1993)).    Finally, Budzinski advances evidence from which a reasonable jury could find the requisite incompetence or unfitness and could conclude that Defendants knew or should have known of same.  (*See, e.g.*, Dkt. 88-1 at 3–5; Dkt. 88-2 at 2–19; Dkt. 89-1 at 1–3, 5–7, 29–33.)  *See Harvey Bldg., Inc. v. Haley*, 175 So. 2d 780, 782 (Fla. 1965) ("The existence of express or implied knowledge is usually a problem for the jury to resolve.").

As to the second argument, Belisle and Cosker note, (Dkt. 82 at 22 n.35; Dkt. 83 at 23), that under Florida law, negligent employment claims against company officers in their individual capacities require that the officers possess "at least knowledge amounting to acquiescence" in the complained-of misconduct, *Jones v. Vasilias*, 359 So. 3d 10, 14 (Fla. Dist. Ct. App. 2023) (emphasis omitted) (quoting *Costa Inv'rs, LLC v. Liberty Grande, LLC*, 353 So. 3d 627, 634 (Fla. Dist. Ct. App. 2022)). However, as stated above, the record contains evidence from which a reasonable jury could determine that Belisle and Cosker had such knowledge.  (*See, e.g.*, Dkt. 88-1 at 3–5; Dkt. 88-2 at 2–19; Dkt. 89-1 at 1–3, 5–7, 29–33.)  *See Harvey Bldg.*, 175 So. 2d at 782.  They are therefore not entitled to summary judgment on this basis.

As to the third argument, about collateral estoppel, Defendants bear the burden of satisfying the elements of the doctrine.  *See In re McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989) ("The party seeking to invoke collateral estoppel bears the burden of proving that the necessary elements have been satisfied.").  Defendants fail to meet this burden.  They make conclusory mention of collateral estoppel in footnotes in their summary judgment motions.  (Dkt. 82 at 23 & n.37; Dkt. 83 at 22 & n.27.)  Such

passing references do not suffice to bring the issue before the court. *See U.S. Sec. & Exch. Comm'n v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 811–12 (11th Cir. 2015) (holding that the defendants forfeited arguments when the defendants "failed to flesh out [the] arguments, except by referring to them in a footnote" (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014))). Defendants' replies elaborate on the collateral estoppel issue, again in footnotes, (Dkt. 91 at 6 & n.22; Dkt. 92 at 6 & nn.17–19), but this elaboration "come[s] too late," *Moore v. Cecil*, 109 F.4th 1352, 1366 (11th Cir. 2024) (quoting *Sapuppo*, 739 F.3d at 683); *accord Purcell v. City of Fort Lauderdale*, 753 F. Supp. 3d 1308 n.8 (S.D. Fla. 2024) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." (quoting *Bank of Am., N.A. v. Mukamai* (*In re Egidi*), 571 F.3d 1156, 1163 (11th Cir. 2009))). Accordingly, Defendants' collateral estoppel argument fails.

In light of the above, Defendants are not entitled to summary judgment on Budzinski's independent contractor claims. Their motions are thus denied with respect to these claims.

### 4. Libel

As indicated above, the parties have stipulated that on June 7, 2023, Cosker emailed JS Watersports II: "I want to give you a heads-up that the gentleman who defaulted on the 52 overseas has filed a temporary restraining order on the boat." (Dkt. 81 ¶ 53.) Budzinski alleges that through this email, Cosker committed libel by falsely informing JS Watersports II that Budzinski had defaulted on the boat. (Dkt. 70

¶¶ 195–200.)  According to Budzinski, although he "was not identified by name" in the email, "he could have been readily identified by a review of public records, including this [c]ourt's docket." (*Id.* ¶ 197.)  Budzinski claims that the email injured him by, "[a]mong other things," facilitating the boat's sale and delivery to JS Watersports II such that Budzinski could not recover the boat. (*Id.* ¶ 200.)  Budzinski also alleges that statements like that in Cosker's email "would tend to hold [an] allegedly 'defaulting' purchaser [like Budzinski] up to ridicule and disrepute in the community." (*Id.* ¶ 199.)  Cosker moves for summary judgment on the libel count arguing only that Budzinski cannot establish an injury caused by the email. (Dkt. 83 at 23–24.)  In Cosker's view, the record does not support Budzinski's theory of injury—facilitating the boat's sale and delivery to JS Watersports II—because the email was sent after Budzinski terminated his agreement with MPN, after Marinex International sold the boat to JS Watersports II, and after Budzinski filed the complaint in this action. (*Id.* at 24.)  Budzinski responds that the reputational harm he testified to suffering as a result of Cosker's email suffices to establish the injury for the libel count. (Dkt. 89 at 20.)

"Under Florida law, libel is defined as the unprivileged written publication of false statements that cause injury." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999). "To recover for libel . . . under Florida law, a plaintiff must demonstrate that . . . the defendant published a false statement . . . about the plaintiff . . . to a third party" and that the plaintiff "suffered damages as a result of the publication." *Thompson v. Orange Lake Country Club*, 224 F. Supp. 2d 1368, 1376 (M.D.

Fla. 2002).  Florida law recognizes two theories of libel: libel per se and libel per quod.
*See Barry Coll. v. Hull*, 353 So. 2d 575, 578 (Fla. Dist. Ct. App. 1977) ("Under Florida
law, false written statements may be either libel per se or libel per quod.").  Although
damages must be proven for libel per quod, they may be presumed for libel per se in
cases not involving media defendants.  *See Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x
863, 865 (11th Cir. 2015) ("Per se defamatory statements are 'so obviously defamatory'
and 'damaging to reputation' that they 'give rise to an absolute presumption both of
malice and damage.'" (alteration adopted) (quoting *Wolfson v. Kirk*, 273 So. 2d 774,
776 (Fla. Dist. Ct. App. 1973))); *Harris v. Plapp*, 386 So. 3d 185, 190 (Fla. Dist. Ct.
App. 2022) ("In the case of words actionable per se[,] their injurious character is a fact
of common notoriety established by the general consent of men[,] and the court
consequently takes judicial notice of it.  They necessarily import damage[,] and[]
therefore, in such cases[,] general damages need not be pleaded or proved but are
conclusively presumed to result[,] and special damages need not be shown to sustain
the action." (quoting *Joopanenko v. Gavagan*, 67 So. 2d 434, 436 (Fla. 1953))); *Blake v.
Ann-Marie Giustibelli, P.A.*, 182 So. 3d 881, 884–85 (Fla. Dist. Ct. App. 2016)
(indicating that libel per se, including the presumption of damages, "still exists in
Florida" after *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), in cases not involving
media defendants).

Libel per se requires that the published material, "considered alone without
innuendo, . . . tends to subject one to hatred, distrust, ridicule, contempt[,] or
disgrace," "to injure one in [one's] trade or profession," or to "impart[] conduct,

characteristics[,] or a condition incompatible with the proper exercise of [one's] lawful business, trade, profession, or office." *Harwood v. Bush*, 223 So. 2d 359, 361 (Fla. Dist. Ct. App. 1969); *accord Walsh v. Mia. Herald Publ'g Co.*, 80 So. 2d 669, 671 (Fla. 1955) ("So far as is relevant here, a publication is per se libe[l]ous if it tends to subject one to distrust, ridicule, contempt[,] or disgrace[] or tends to injure one in his trade or profession."). However, libel per se does not require that the published material identify the plaintiff by name so long as it "contains matters of description or reference to facts and circumstances from which others may understand that [the plaintiff] is the person referred to." *Harwood*, 223 So. 2d at 362 (quoting *O'Neal v. Tribune Co.*, 176 So. 2d 535, 548 (Fla. Dist. Ct. App. 1965)).

The complaint does not specify a theory for the alleged libel. (*See* Dkt. 70 ¶¶ 195–200.) Cosker asserts that the complaint pleads libel to the exclusion of pleading libel per se, and he supports this assertion by noting that Budzinski claims a particular injury related to the boat. (Dkt. 91 at 7 (citing Dkt. 70 ¶ 200).) Viewing the record in the light most favorable to Budzinski, *see Skop*, 485 F.3d at 1136, the court disagrees with Cosker's assertion for two reasons. First, libel and libel per se are not opposites: as explained above, libel per se is a theory of libel, and libel per quod is the opposite theory. *See Barry*, 353 So. 2d at 578. Second, Budzinski's allegation that statements like Cosker's "would tend to hold [an] allegedly 'defaulting' purchaser up to ridicule and disrepute in the community," (Dkt. 70 ¶ 199), is close enough to the description of certain per se libelous statements as "tend[ing] to subject one to hatred, distrust, ridicule, contempt[,] or disgrace," *Harwood*, 223 So. 2d at 361, that Budzinski has

sufficiently pleaded libel per se. *See GRLPWR, LLC v. Rodriguez*, No. 3:23cv16480-TKW-HTC, 2023 WL 5666203, at *4, 2023 U.S. Dist. LEXIS 156928, at *9–10 (N.D. Fla. Aug. 25, 2023) (deeming "sufficient to state a plausible claim for defamation per se" allegations that the "[d]efendant's accusations . . . subjected [the plaintiff] to 'ill repute' with the general public" and reasoning that "being held in 'ill repute' is akin to being subjected to distrust, contempt, or disgrace").

If Budzinski proceeds under the theory of libel per se, he does not need to support his damages with evidence because they are presumed, provided that Cosker is not a media defendant, *see Alan*, 604 F. App'x at 865; *Harris*, 386 So. 3d at 190; *Blake*, 182 So. 3d at 884–85, and Cosker does not argue that he is such a defendant, (*see* Dkts. 83, 91). *See Greenbriar, Ltd. v. Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (indicating that in general, unargued issues are forfeited). Cosker also does not argue, *see id.*, that statements falsely accusing individuals of defaulting on payments for boats do not amount to libel per se, (*see* Dkts. 83, 91), and the law supports that they may, *see Vinson v. Ford Motor Credit Co.*, 259 So. 2d 768, 770 (Fla. Dist. Ct. App. 1972) (deeming libel per se, when the plaintiff had a history of working as a credit manager, incorrect statements to a credit bureau that the plaintiff's car had been repossessed and that his payment record had been unsatisfactory); *cf. Klein v. Receivable Mgmt. Grp., Inc.*, 595 F. Supp. 3d 1183, 1191 (M.D. Fla. 2022) ("A plaintiff suffers a concrete injury when a credit reporting agency violates the Fair Credit Reporting Act by releasing 'untruthful disclosures' about the plaintiff because that new harm is similar enough to the old harm 'at issue in common-law causes of action like defamation or libel per se.'"

(quoting *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017))).   In addition, Budzinski testified during his deposition that the email caused him "reputational harm" and that he "los[t] money as a result of" the email because of Cosker's role in preventing recovery of the boat.  (Dkt. 89-3 at 8.)  For all these reasons, Cosker is not entitled to summary judgment on the libel count against him.

### 5. Indemnification

Mystic Powerboats' sales agreement with Marinex International contains an indemnification provision stating that Marinex International

> indemnifies, releases[,] and holds [Mystic Powerboats] and its [a]ffiliates, owners, officers, directors, employees, and agents harmless from and against any and all claims, liabilities, expenses, costs, and damages, including attorney[] fees, alleged against or incurred by [Mystic Powerboats] in connection with or arising out of . . . the negligence, carelessness, or any action or inaction of [Marinex International].

(Dkt. 84-2 at 20.)  Based on this provision, Mystic Powerboats and Cosker assert a contractual indemnification cross-claim against Marinex International "for any damages stemming from the underlying suit in this matter."  (Dkt. 38 at 14; *accord id.* at 15 (alleging that "to the extent that any damages, costs, expenses, [or] attorney[] fees are assessed against [Mystic Powerboats and Cosker] in the underlying matter, Marinex [International] is responsible for indemnifying them as to any such damages, costs, expenses, [and] attorney[] fees.").)  Marinex International denies liability on the cross-claim.  (*See* Dkt. 46 ¶ 20.)

Mystic Powerboats and Cosker move for summary judgment as to Marinex International's liability.  (Dkt. 84.)  They argue that by its plain language, the

indemnification provision requires Marinex International to indemnify not only Mystic Powerboats but also Cosker as Mystic Powerboats' CEO. (*Id.* at 8.) They further maintain that the provision is unambiguous and is enforceable under Florida law because it does not seek to indemnify Mystic Powerboats for Mystic Powerboats' own wrongful conduct. (*Id.* at 8–9.) According to Mystic Powerboats and Cosker, Budzinski's claims against them—"including allegations of an improper broker arrangement, an artificially complex sales structure, and price inflation—arise directly from" Marinex International's conduct: Mystic Powerboats and Cosker "played no role in selecting MPN as a buyer, no role in MPN's price manipulation, and no role in the eventual resale of the [v]essel." (*Id.* at 9; *accord* Dkt. 90 at 2–5.) Marinex International responds that because Budzinski's claims against Mystic Powerboats and Cosker are based on their own alleged wrongful conduct rather than on vicarious liability for Marinex International's misconduct, the court cannot conclude as a matter of law that the indemnification provision applies. (Dkt. 86 at 2, 8–10.) The court agrees with Marinex International on this point.[3]

---

[3] Marinex International's other argument—that Budzinski's claims against Mystic Powerboats and Cosker fall outside the indemnification provision's scope because they do not arise out of Marinex International's actions, (Dkt. 86 at 2, 10–12)—is unpersuasive, in part because in focusing on the "arising out of" language in the provision, it overlooks the "in connection with" alternative, (*see* Dkt. 84-2 at 20.) As Mystic Powerboats and Cosker indicate, (Dkt. 90 at 4–5), the phrase "arising out of" carries a broad meaning associated with causation. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005) ("The term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to[,]' or 'having a connection with.'" (quotation omitted)). The phrase requires "some causal connection[] or relationship" rather than "a mere coincidence" but "does not require proximate cause." *Id.* at 539–40 (quotation omitted). In contrast, "the phrase 'in connection with[]' . . . does not ordinarily refer to causal connection" alone. *Jacksonville Terminal Co. v. Ry. Express Agency, Inc.*, 296 F.2d 256, 260 (5th Cir. 1961), *abrogated on other grounds as stated in Nw. Nat'l Ins. Co. v. Dade County*, 461 F.2d 1158, 1163 (5th Cir. 1972); *see United States v. James*, No. 23-11972, 2025 WL 1242792, at *4, 2025 U.S. App.

In Florida, indemnity provisions "are subject to the general rules of contractual construction" and, as such, are "construed based on the intentions of the parties." *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 643 (Fla. 1999). However, indemnity provisions that "attempt to indemnify a party against its own wrongful conduct will be enforced 'only if they express an intent to indemnify against the indemnitee's own wrongful acts in clear and unequivocal terms.'" *Cox Cable Corp. v. Gulf Power Co.*, 591 So. 2d 627, 629 (Fla. 1992) (quoting *Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equip. Co.*, 374 So. 2d 487, 489 (Fla. 1979)); *accord Gibbs v. Air Canada*, 810 F.2d 1529, 1534 (11th Cir. 1987) ("Under Florida law, agreements to indemnify parties against their own wrongful acts are not favored and will be enforced only if they express such an intent in clear and unequivocal terms."). "[T]he public policy disfavoring contractual indemnification for one's own negligence applies with equal force in instances where the indemnitor and indemnitee are jointly liable." *Battle v. Gold Kist, Inc.*, No. 3:06-cv-782-J-32TEM, 2008 WL 8833747, at *2, 2008 U.S. Dist. LEXIS 50384, at *7–8 (M.D. Fla. July 1, 2008) (citing *Cox Cable*, 591 So. 2d at 629). Absent "a clear and unequivocal contractual expression of intent, any fault of the indemnitee that is a legal cause of its own loss will negate the contractual indemnitor's obligation." *Gibbs*, 810 F.2d at 1534–35.

---

LEXIS 10414, at *10 (11th Cir. Apr. 30, 2025) (interpreting a federal sentencing guideline provision and explaining that "a person possesses a firearm 'in connection with' another offense if the firearm possession is *contextually, causally, or logically related* to that offense" (emphasis added)); *see also Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (applying admiralty law when explaining that a provision referring to "'all disputes arising out of or in connection with' [an] agreement . . . purports to govern all disputes having a connection to the agreement" (internal quotation marks omitted)).

Mystic Powerboats and Cosker do not contend that the indemnification provision attempts to indemnify them against their own wrongful conduct in clear and unequivocal terms; indeed, they assert the opposite: that "the indemnity provision . . . does not seek to indemnify Mystic [Powerboats] for its own wrongful conduct." (Dkt. 84 at 8–9; *see* Dkt. 86 at 8 (pointing out that Mystic Powerboats and Cosker "acknowledge that the [provision] does not indemnify them for their own wrongful conduct").) The court agrees that the provision does not clearly and unequivocally express an intent to indemnify Mystic Powerboats and Cosker for their own misconduct. *See Cox Cable*, 591 So. 2d at 629 (explaining that general "from and against any and all claims" language does not clearly and unequivocally demonstrate an intent to indemnify a party for its own wrongful acts).

Budzinski does not pursue a theory of vicarious liability against Mystic Powerboats and Cosker. (*See* Dkt. 70.) Instead, he seeks to hold them directly liable for their own alleged misdeeds. (*See id.*) Although they maintain that they "played no role in" the complained-of scheme against him, (Dkt. 84 at 9), the record viewed in the light most favorable to Marinex International, *see Skop*, 485 F.3d at 1136, supports that they did in fact play a role, (*see, e.g.*, Dkt. 81 ¶¶ 5–8, 11, 15; Dkt. 86-1 at 8; Dkt. 86-2 at 7). Because Mystic Powerboats and Cosker's liability, if any, to Budzinski would be based on their own misconduct rather than "on the basis of vicarious liability for [Marinex International]'s conduct," Mystic Powerboats and Cosker are not entitled to summary judgment on the indemnification issue. *See Battle*, 2008 WL 8833747, at *2, 2008 U.S. Dist. LEXIS 50384, at *8; *see also Gibbs*, 810 F.2d at 1534–35.

- 40 -

## CONCLUSION

Accordingly:

1. Defendants' motions for summary judgment as to the claims against them (Dkts. 82, 83) are **GRANTED in part and DENIED in part** as set out in this order.

2. The remaining motions for partial summary judgment (Dkts. 84, 85) are **DENIED**.

**ORDERED** in Orlando, Florida, on May 6, 2025.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record